## Black Mountain Coal Corporation v. Vickers.

May 11, 1943.

260

J. B. Synder for appellant.

George R. Pope for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

In April, 1941, appellee filed claim with the Compensation Board for injuries received in appellant's mine by inhaling "bad air" due to inadequate ventilation. He asserted that he was rendered totally and permanently disabled. Referee Clay, after a long and tedious hearing, found him to be totally permanently disabled by the alleged injury, and that he was entitled to allowance as fixed by KRS 342.095. It was agreed that parties had accepted the terms of the act, and appellee's average weekly wage was sufficient to entitle him to maximum compensation, if his injury was compensable.

Upon appellant's motion the matter was passed to the full Board and it upheld the finding. The circuit court, on appeal, upheld the Board's conclusions. There is little question of procedure, it being insisted by appellant that the proof shows the claim to be ill-founded, and an afterthought; that it is not shown that Vickers breathed bad air, but if so his disability arose solely from pre-existing disease. That our rulings in "bad air" cases do not justify or sustain the award here made, citing American Rolling Mill Co. v. Pack, 278 Ky. 175, 128 S. W. (2d) 187; Fannin v. American Rolling Mill Co., 284 Ky. 188, 144 S. W. (2d) 228; Consolidation Coal Co. v. Marcum's Adm'r, 289 Ky. 220, 158 S. W. (2d) 150.

Vickers, a married man with several children, and about thirty-seven years of age at the time of the alleged injury, had been engaged in mining for appellant for about five years, and was admittedly a good miner. The record shows by lay witnesses that he was a strong ablebodied man prior to the injury, though it is shown that he had theretofore suffered from the flu, and had been "down" more than once from bad air. He underwent a favorable physical examination in 1936.

On February 11, 1941, he, Lee Frederick and Winston Cox were working on a night shift in mine 31, on what is known as a three-way system, in the heading of No. 2 main left. Cox was working at a heading on one side of the main left; Frederick on another, and on the

right and left of the air course. Vickers was in the main left heading, and about 90 feet from the air course which ran from right to left, passing but not entering directly any one of the places where the three were working on the night shift from 4 until 11 p. m.

Vickers said that when they went about 20 feet in the entry it was smoky. They shot down some coal and laid some track. He then went into the heading, loaded one car, and tried loading another, but his head "went to hurting; felt sick at my stomach and vomited." He went to the break-through to get air; went back and "we loaded—the last car I didn't get loaded good." He said he was too sick to do good work. He went to the break-through and laid down for an hour. He then went to where his "buddy" was loading in the air course, vomited again and laid down. One of his gang said, "they ain't no down air in here." The other two loaded until quitting time, and he and his buddies met in the air course in the main heading and made the man trip to the outside. Vickers, after taking a bath, started with his buddies to Disney, about three-fourths of a mile distant where they lived. He says there was smoke in the room where he was working; when the motor came in it would push the smoke back and it "died" in there. He described just how the air affected him. He said that though he had tried mine work at one time, and outside work once thereafter, he was unable to continue. The morning following, still feeling the effects of the air, he went to, or sent for, the company doctor.

Some of the doctors, and several laymen, testified that Vickers' mind was unsound, and while his testimony was given in a fairly intelligent manner he made many rambling and incoherent statements. Frederick testified that on February 11th the three were mining out a part of No. 2 left main heading, and according to plans were working on break-throughs to the right and left air course. At the time, however, it seems that Vickers was working ahead of the point where the break-through would pass through No. 2 left main in order to reach the right and left air course. He said that Vickers came to where he was, complaining with his head and stomach, "he was awful sick." He thought Vickers had been working about 80 feet ahead of the air current running from right to left, and he and Cox were further away from the air course; that at most of the time they got

fresh air, but at times it made him "awful dizzy." When the trap door was open "we would not get any air, and I have seen them open a lots of times." This witness said that he had gotten dizzy several times, and once that night without serious effect. He said that he reported to superiors that the air was bad; this was before the night when Vickers got sick; that Feichter had told somebody not to work in the main heading until the break-through was completed. He expressed the belief that bad air was the cause of Vickers' sickness.

Cox testified to substantially the same effect, and that Vickers was all right when he went on the shift, but came out of his place once complaining about the air, and later they all left on the man trip, and went home. Vickers complained of his head and stomach, and walked "very slow." Cox did not feel any effect of bad air that night, but had before that time. He also said that the day after Vickers got sick Feichter, the foreman, put a log across a main left heading above the cross break-through as a warning for men not to work in that direction until the break-through was completed.

The timber and brattice man in the section where Vickers was working, explained how air circulated through the air course. He said that if any of the trap doors on the course on either side were left open it would short circuit the air. He had seen the trap doors open at one time, but did not know their condition at this particular time. He had complaints about the air, but none on that particular day; that if Vickers was working 90 feet away from the air course he was working there without authority of the foreman. Other testimony went toward showing that Vickers was in good health and a good miner before the alleged injury; as to his condition thereafter, and experiences of other miners with bad air and its effects. Several miners testified that they believed bad air was the cause of his disability.

Dr. Giannini, chief physician and surgeon of appellant, was on vacation at the time Vickers became ill, and Dr. Carr was acting in his stead. He called upon Vickers at home shortly after the 11th of February and found him ill; he had fever, complaining of severe headache, vomiting and some reddening of the eyes; he was suffering from a shock. His examination, with history, led him to a thought of a possibility of meningitis, or a form

of syphilis, or carbon monoxide intoxication. He made blood tests for meningitis, syphilis and cerebral hemorrhage, all negative. By process of elimination he reached the conclusion that his condition was due to bad air suffocation, and he followed routine treatment. He said that bad air affected the blood stream and had a damaging effect on the nerve tissues of the brain. Dr. Carr had seen Vickers professionally since his treatment in the first instance, some three or four times, and declared he "was a very sick man mentally; he is in a state of insanity, and not in a condition to do any manual labor." Later he testified that in November, 1941, he had seen Vickers and that his condition had grown a "little worse." His talk was halting, stammering and with little intelligence.

Dr. Giannini returned about March 2, and had Vickers placed in the hospital and examined him there. He said he was complaining of headache and nervousness. He concluded that he was suffering from arteriosclerosis, which leads to degeneration of the brain. The disease was a little unusual, but not impossible in a man of Vickers' age. He was of the opinion that there were no indications which would lead to a conclusion that Vickers was a victim of bad air. He took him to Dr. Spurling, a nerve and brain specialist in Louisville. Dr. Spurling examined him on March 17; took a history of Vickers' case, and concluded that he had marked hardening of the arteries, probably reaching the brain. While the doctor expressed a lack of competency to testify as to effects of bad air, which affects the nervous system, he found nothing which to his mind would indicate that the nervous system or brain defect was attributable to bad air.

Dr. Kinsman, at Dr. Spurling's request, examined Vickers on March 19; this was a routine test of vital organs and laboratory tests. His examination resulted in two conclusions: He found hardening of the arteries, which in degree was more than usual in a man of Vickers' age. He did not think Vickers' brain was affected to a marked degree, "except that he seemed to be slow in thinking." The doctor would not say that any of his condition was not to be attributed to monoxide poisoning, but "that the hardening of the arteries was not due to breathing bad air. On the other hand some of the symptoms, weakness, fatigue, etc., I think conceivably could have been due to the inhalation of bad air. It is

well known that people who have hardening of the arteries are more susceptible to carbon monoxide poisoning than normal people, and since we know this I think it is possible that some of these symptoms may be attributed to carbon monoxide.''

On September 18, 1941, Vickers was examined by Dr. Hill, a psychiatrist at Knoxville. He had history from relatives and Dr. Carr. Vickers was in a bad mental state; he was depressed; had delusions and his judgment was not good; his mental condition was such as to require institutional care. In short, he said he was crazy, and his condition was permanent, without chance of improvement. Dr. Hill was positive that he did not suffer from arteriosclerosis, and with equal positiveness attributed the condition to breathing bad air. He was sure that Vickers was not malingering.

The foregoing is in substance the medical testimony, and a reading discloses one fact, that Vickers' condition was such that he is totally and permanently disabled for manual work, without hope of betterment.

Other proof, if it be of materiality, that is as introduced by appellant, may be briefly summarized. Feichter, assistant mine foreman, described the mine and the general outlay. He said he had directed the three men to work at points where the break-through would be completed to the right and left of the air course, and that Vickers, at the time he claimed he breathed bad air, was working some distance ahead of the break-through he was supposed to be working out. He had never had any complaint of bad air, and that he was told by the night foreman that the trap on No. 27 was not open on the occasion. He admitted that on the day after Vickers became ill he had put a piece of timber across the track to keep miners from going up into the heading.

Vickers had a group policy certificate insuring him against loss of time by reason of illness. The injury occurred on February 11, and he filed claim on April 11, 1941, in which he stated that his sickness began on February 11, describing his symptoms, and in answer to a query: ''If injured state fully how the accident occurred?'' and ''What were you doing at the time?'' stated, ''So far as I know this trouble was not caused by a mine accident.'' Dr. Giannini signed the statement reporting that the disability arose from arteriosclerosis.

The statement was written by some person other than Vickers, since he signed by mark, with attesting witnesses. His compensation claim was filed April 22. It does not appear that Dr. Carr had ever told him of the result of his diagnosis. Vickers' action in this respect was a circumstance to be considered by the Board. American Rolling Mill Co. v. Stevens, 290 Ky. 16, 160 S. W. (2d) 355; Black Mountain Corp. v. McGill, 292 Ky. 512, 166 S. W. (2d) 815.

Appellant complains that the employer did not receive timely notice of an injury or disability, and further that since the proof showed that if the injury was received it was at a place where Vickers was not required to work at the time. The first point is not urged as a ground for setting aside the award but apparently to impress the suggestion that Vickers' immediate illness or his following disability as a basis for his claim of injury from carbon monoxide was an afterthought, since he had formerly made no complaint of bad air. The record shows that Vickers had notified several employees of his illness, and that superior officers had this knowledge. It is true that there was no written notice, but the record shows that Dr. Carr, who was physician in charge, examined Vickers within a few days after he was stricken, and later made a report showing that he claimed illness from bad air. Dr. Giannini, the regular physician, returned from Florida about the middle of March, and had before him Dr. Carr's report. Robinson, mine manager, had been told shortly after February 11 that Vickers was "complaining of being down on bad air." John Foy, a night boss, heard of the complaint in five days after the 11th, and made investigation. That there was sufficient notice see: Elkhorn Coal Co. v. Combs, 214 Ky. 635, 283 S. W. 1007; Black Mountain Corp. v. Murphy, 218 Ky. 40, 290 S. W. 1036.

This is one case in which we must agree to some extent with the suggestion of the referee, that this "is a border line case * * * with good reasons for decision either way * * * but in view of the often expressed purpose of the Act, the Board is of the opinion that the doubt should be resolved in favor of the injured employee." The Board, however, did not give similar expression of opinion.

The testimony of Dr. Kinsman might have justified the Board in concluding that Vickers' disability was due

to injury from bad air and the pre-existing disease. This point was not stressed by appellant before the Board; the appellant seems to have stood squarely on the ground that inability to work was occasioned solely by the pre-existing disease. The Board no doubt took this situation into consideration in making its award.

We close our opinion with a quotation from Dixie Ice Cream Co. v. Ingels, 291 Ky. 39, 41, 163 S. W. (2d) 20, 21:

> "Were we sitting as a fact finding body, our finding would probably differ from that of the Board, but it is only where there is no substantial evidence having a tendency or fitness to induce conviction that the courts are justified in setting aside awards of the Board."

In view of the long established rule we are compelled to affirm the judgment and award.